1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                   **SOUTHERN DISTRICT OF CALIFORNIA**
10
11   ANTONIO VALENTINO,                    Case No. 12-cv-00917-LAB (MDD)
12                          Petitioner,     REPORT AND
                                           RECOMMENDATION
13           vs.                           RE: PETITION FOR WRIT OF
                                           HABEAS CORPUS
14   W.J. SULLIVAN, Warden,
15                          Respondent.
16                     **I.  INTRODUCTION**
17        This Report and Recommendation is submitted to United States
18   District Judge Larry A. Burns pursuant to 28 U.S.C. § 636(b)(1) and Local
19   Civil Rule 72.1(d) of the United States District Court for the Southern
20   District of California.
21                 **II.  FEDERAL PROCEEDINGS**
22        Antonio Valentino ("Petitioner"), a California state prisoner
23   proceeding *pro se* and *in forma pauperis*, filed a Petition for a Writ of
24   Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C.
25   § 2254.  (ECF No. 1.)  Petitioner challenges his conviction in San Diego
26   Superior Court Case No. SCD 207640 for robbery, two attempted
27   robberies, special circumstance murder, and enhanced firearm charges.
28   (ECF No. 1 at 1.)

The Petition asserts four grounds for relief: (1) Petitioner claims his federal constitutional rights were violated when evidence of a previous robbery conviction was improperly introduced at trial; (2) Petitioner claims that digitally enhanced photographs were improperly introduced as evidence at trial; (3) Petitioner claims the combined and cumulative effect of these and other errors unfairly prejudiced the trial; and (4) Petitioner incorporates by reference all beneficial arguments raised by his co-defendant, Sadiq Saibu, in Saibu's petition for habeas relief.[1] (ECF No. 1 at 6, 15, 22, 23.)

On July 18, 2012, Respondent answered the Petition and lodged portions of the state court record.  (ECF Nos. 12, 13.)  Respondent contends habeas relief is not appropriate because the California Court of Appeal properly rejected petitioner's evidentiary arguments and acted in accordance with clearly established federal law.  (ECF No. 12 at 11-12, 19-20, 26-27.)  On October 15, 2012, Petitioner filed his Traverse.  (ECF No. 21.)

### III.  **STATE PROCEEDINGS**

On June 23, 2008, Valentino was charged by information with special circumstance murder; attempted murder; attempted robbery; theft; and two counts of robbery.  (Lodg. No. 11 at 17.)  The information further alleged that Valentino personally discharged a handgun during the commission of the alleged crimes.  (*Id*. at 18.)

Valentino was tried by a jury with co-defendant Saibu.  The jury found Valentino guilty on all counts, and found the firearm enhancement allegations to be true.  (*Id*.)  On May 8, 2009, Valentino was sentenced to a life sentence without possibility of parole and an additional 31-year

---

[1]Sadiq Saibu filed a separate federal habeas petition in the Southern District of California on June 25, 2012.  *See* Case No. 12-cv-01564 (ECF No. 1).

1  sentence to be served consecutively. (*Id.* at 19.)

2       Valentino appealed his conviction and on January 4, 2011, the

3  California Court of Appeal affirmed in part, reversed in part, and

4  remanded for further proceedings. (Lodg. No. 11.) The Court of Appeal

5  affirmed the trial court's admission of the bank robbery conviction, the

6  admission of the digitally enhanced photographs, and rejected the

7  cumulative error claims. (*Id.*) The Court of Appeal reversed Saibu's

8  conviction for special circumstance murder finding fault with a jury

9  instruction, and remanded Saibu's case for further proceedings consistent

10 with that finding. (*Id.*) The Court of Appeal also ordered the trial court

11 to correct administrative errors on Valentino's record. (*Id.*) The Court of

12 Appeal's opinion was certified for partial publication on January 11,

13 2011. (Lodg. No. 12.) On February 18, 2011, Petitioner appealed to the

14 California Supreme Court. (Lodg. No. 13.) The California Supreme

15 Court denied review. (Lodg. No. 15.)

16 ## IV.  STATEMENT OF FACTS

17      "[A] determination of a factual issue made by a State court shall be

18 presumed to be correct." 28 U.S.C. § 2254(e)(1). This Court must be

19 "particularly deferential to [its] state court colleagues." *Taylor v.*

20 *Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). The following facts from the

21 California Court of Appeal's opinion are presumed correct:

22     *Factual Background*

23        During the summer of 2005, Saibu and Valentino
24     spent time with Raheem Judd, Keith Coleman, Coleman's
       girlfriend Rachel Kinsel, Dewayne Cummings and Ken
25     Buckley at Judd's mother's home on Clay Street in
       southeast San Diego.
26

27     *1. The July 7, 2005 Hollywood Video store robbery*

28        At approximately 9:45 p.m. on July 7, 2005, two
       African-American men wearing hooded sweatshirts entered

a Hollywood Video store on El Cajon Boulevard.  One man
was wearing a gray sweatshirt, and the other was wearing
a black sweatshirt.  Both men covered the lower portions of
their faces with black bandanas.  Shift leader Toni Oliver
was working near the entrance of the store that night.  As
the two men entered the store, Oliver turned to greet them.
After she turned away, she heard one of the men shout,
"Everyone get down.  This is a robbery."

The man who was wearing the gray hooded
sweatshirt had darker skin than the other man and was
carrying a shotgun.  The man with the shotgun said
something like, "I don't want to have to kill someone
tonight," or "Am I going to have to kill anybody today?"
The man in the black sweatshirt had a pistol and a black
duffel bag.  The man in the black sweatshirt went to the
register and told Oliver to "[h]urry up" and "[g]ive [him] the
money."  Oliver gave the man approximately $75 from the
register.  Another employee, June Collins, emptied another
register and put the money in the duffel bag that the man
in the black sweatshirt was carrying.

Mathew Gillie worked at the Hollywood Video store in
an area of the store called Game Crazy.  Game Crazy closed
at 10:00 p.m., although the rest of the store remained open
until midnight.  Gillie was preparing to close Game Crazy
when he heard someone yelling.  Gillie saw a man wearing
a gray hooded sweatshirt and holding a shotgun inside the
store.  That man told Gillie not to play around or mess with
him.  Based on the man's voice, Gillie believed the man was
African-American.  Gillie gave the man approximately
$650, which was the money for the night deposit from the
Game Crazy register.

Alejandro Rivera and Stephanie Jenkins lived in an
apartment located across the alley behind the Hollywood
Video store.  On the night of the robbery, they were moving
out of their apartment.  Rivera was driving a U-Haul truck
down the alley intending to back the truck into the
driveway of the apartment when he saw two individuals
who were wearing baggy clothes – including hooded
sweatshirts – looking into the Hollywood Video store.  As
Rivera was watching the men, they turned the corner and
disappeared.

Jenkins, who had just driven her car through the
parking lot of the Hollywood Video store, drove into the
alley and parked her car across the alley from the U-Haul
truck.  She heard someone yelling and then saw two men
holding guns, running down the alley.  The men had their

hoods pulled up over their heads, partially concealing their faces.  However, the lighting in the alley was good, and Jenkins could see the top portions of the men's faces.  She believed that both men were African-American.

Rivera also saw the men running through the alley.  The men  were wearing bandanas and holding guns.  The men ran "full speed"  toward the U-Haul truck, and then ran through the small space between the truck and the apartment building.  The men continued  running to the end of the alley and turned right at the street.  Rivera  and Jenkins ran into their apartment and did not go back outside until they saw that police officers had arrived.

The Hollywood Video store had five surveillance cameras.  San Diego police officers arrived at the store a few minutes after the  robbery.  Oliver provided the surveillance video of the robbery to Detective Ronald Hall.  The video was played for the jury at trial.  Oliver testified that the surveillance video accurately depicted the robbery.

*2. The July 12, 2005 T&M Liquor store attempted robbery*

At approximately 11:15 p.m. on July 12, 2005, Farouq Mikho was counting money and preparing the register receipts at the front counter of the T&M Liquor store, which is located on El Cajon Boulevard in the City Heights area of San Diego.  Mikho's girlfriend, Paula Vargas, was standing at the counter talking to Mikho, waiting for him to close the store.

Mikho saw a man wearing a black hooded sweatshirt with the hood over his head and a bandana covering his nose and mouth.  The man pointed a shotgun at Mikho's face and yelled for Mikho to "give him the money."  The man also pointed the gun at Vargas and directed her to "get down" and not to move.  Vargas could see the man's face and could tell that he was a dark-skinned African-American.

Mikho grabbed the money out of the register and threw it on the counter.  The man told Mikho to put the money in a bag.  As Mikho reached for a bag, he pressed the silent alarm button.

Augustine Garcia was in the cooler at the back of the store when he heard a man yelling.  Garcia heard the man say, "Put the money in the bag or I'm going to blow your head off," or something similar to that, and he concluded that "it was like a holdup."  Garcia started running toward the front of the store and saw a man pointing a shotgun at

Mikho.

Garcia, who is in his 50's and is five-feet-four inches tall, came up behind the man and grabbed the man's elbows.  The man was stiff and holding the gun high and close to his body.  Garcia was able to lift the man about three or four inches off the ground and turn the man's body, and the gun, away from Mikho and Vargas.  Garcia and the man both fell to the floor, and Garcia landed on top of the man.  The force of hitting the floor knocked the shotgun out of the man's hands and it slid away from both of them.  The man struggled to get out from underneath Garcia, who was attempting to hold him down.  The man eventually was able to get up and run out the door.

Garcia retrieved the shotgun and ran after the man.  When the man was approximately two or three feet away from the alley, Garcia pointed the gun at him and pulled the trigger.  The gun did not fire, and a shell was ejected from the chamber.  Garcia watched the man run into the alley, but decided not to follow him and instead ran back into the liquor store.

Officers patrolling the area received a call about the robbery at 11:17 p.m. and arrived on the scene at 11:20 p.m.  Garcia showed officers the shotgun, which at this point was on the floor behind the front counter.  Garcia also directed the officers to the shotgun shell that was ejected when he attempted to fire the gun at the robber.  Officer David Yu collected the rifle, the six shells inside the rifle, and the shell that had been ejected outside the store.

Detective Eugene Bojorquez collected surveillance video of the attempted robbery from the liquor store's security camera.  The video was played for the jury at trial.  Vargas testified that the video accurately reflected the incident.

On April 4, 2007, Mikho attended a live lineup.  Each of the men in the lineup held a shotgun and said, "Give me the 'F' money."  Mikho identified the men in positions three and four as sharing some similarities with the suspect from the July 12, 2005 incident.  However, Mikho said that the man in position number four did not have the dark skin tone of the suspect, while the skin tone of the person in position three matched the skin tone of the robber.  That man's eyes and nose also looked familiar to Mikho.  The man in position number 3 was Saibu.

The shotgun and shotgun shells that police recovered from the scene were tested for DNA.  The lab technician determined that Saibu was a major contributor of the DNA

that was found on the textured areas and on the trigger of the shotgun.

*3. The July 13, 2005 T&M Liquor store murder, attempted murder and attempted robbery.*

At approximately 8:00 a.m. on July 13, 2005, Lap Tran drove his Mercedes Benz to the auto repair shop that he owns in Lemon Grove. Tran parked the car in front of the shop and left the keys in the car. At around 11:00 a.m., Tran noticed that his car was gone.

Tran had seen Valentino with another customer at the repair shop the day before his car was stolen. The auto repair shop was located approximately a block and a half from the Value Inn Hotel, where Valentino had been staying.[2]

That day, Ayesha Majid was sleeping on the couch of an apartment that she shared with her brother, Naz Almajid, when Saibu, who is her cousin, came to the apartment. Saibu was being very loud and woke her up. Between 1:30 p.m. and 3:30 p.m., Majid telephoned Almajid to tell him that Saibu had come over to the apartment and that he had gone into Almajid's bedroom.

Later that afternoon, Tran's white Mercedes was used in an attempted robbery at the T&M Liquor store. Store manager Waleed Yakou was sitting behind the counter at the cash register talking with his friend and candy, cigar and cigarette vendor, Doraid Toma, who was standing on the customer side of the counter near the entrance to the store. At approximately 3:40 p.m., a man wearing dark clothing, a bandana on his face, and a hooded sweatshirt with the hood over his head walked into the liquor store. The man pointed a silver revolver at Yakou and said, "Give me the money." Yokou could see the man's face from the middle of his nose to his eyes. Based on the portion of the man's face that he could see, as well as the tone of the man's voice, Yakou thought that the man was African-American and about 19 to 21 years old.

Yakou told the man to calm down and tried to open the cash register. The man said, "Give me the money" several times, and Toma turned in reaction to the man's loud voice. The man then shot Toma in the chest from less

---

[2]

While in jail, Valentino talked on the telephone with his mother, who said to him, "They said that your prints were in that Mercedes . . . that was stolen from across the street from the motel you were staying at."

than five feet away.  Toma appeared surprised and tried to back away from the man.  The man walked toward Toma and, as Toma fell to the floor, shot him again.

While the man was shooting Toma, Yakou pressed the silent alarm button.  The man then walked toward Yakou, who was ducking behind the counter.  The man looked over the counter and fired two shots in Yakou's direction.  Neither bullet hit Yakou.  The man then ran out of the store without taking any money.

Yakou grabbed a gun that was in a drawer behind the counter and went to check on Toma.  Toma was bleeding from his mouth and indicated to Yakou that he could not breathe.

At 4:45 p.m., San Diego Police Officers Jason Scott and Thomas Seiver separately responded to a call regarding the shooting at the liquor store.  Scott arrived to find Yakou with blood on his hands, arms, and shirt, saying, "He shot him."  Someone told Scott that the suspect had run out of the store and had turned southbound in the alley.

Both of the police officers attempted to aid Toma by administering CPR.  Toma was not breathing and did not have a pulse.  Emergency medical personnel arrived at the liquor store and determined that Toma was dead.  Toma died from gunshot wounds to his shoulder and torso.  A bullet was recovered from his body during an autopsy.  Officers also recovered two other bullets from the scene of the shooting.

Officer Scott viewed surveillance video from the liquor store and broadcast a description of the shooting suspect to police officers in the area.  The surveillance video was played for the jury.  Yakou testified that the video accurately reflected the events that he witnessed that day.

Maria Morales lived in an apartment located about two blocks from the T&M Liquor store.  Morales was standing in the alley behind her apartment waiting for her mother when she saw a white Mercedes Benz in the alley.  The driver of the Mercedes drove toward her and parked.  Two African-American men got out of the car and started to change clothes, which Morales thought was suspicious.  The passenger had lighter skin than the driver.  The passenger removed what looked like black tights from his head.  When he removed the tights, Morales could see that he had curly hair.  Both men walked away from the car in the alley wearing dark clothes.  Police later lifted Valentino's left palm print and right palm print from the

- 8 -

trunk of the Mercedes.

That day, Morales attended two live lineups, but was unable to identify anyone.  However, in court, Morales identified Valentino as the passenger of the white Mercedes.  Although his hair was shorter and in braids at trial, she recognized his build, height, and the portion of his face that she had seen on the day of the shooting.

Naz Almajid testified that he clocked out from his job at a Longs Drug store on July 13, 2005 at 10:30 p.m.  He went home and saw the news on the television.  Almajid saw a video clip about the shooting at the T&M Liquor store and Toma's murder.[3]  Almajid knew Toma, and was familiar with the liquor store, which was located two blocks from his apartment.

Almajid testified that he thought it was possible that a .38-caliber pistol that he had purchased from a coworker had been used in the shooting.  Almajid explained that he thought the gun might be his because his sister had called him and told him that Saibu had visited their apartment and gone into Almajid's bedroom, where Almajid kept the gun, the gun in the video was the same caliber as his gun, and the number of shots that had been fired at the liquor store was the same as the number of bullets that were in the gun.  Almajid looked on the internet for video of the shooting, and then looked for his .38-caliber pistol in his bedroom.  He was unable to find the gun.

That night, Almajid had a telephone conversation with Saibu during which he asked Saibu, "That wasn't you right?"  Saibu answered, "No, it wasn't me but. . . ." Almajid asked Saibu, "Were you famous[?]" Saibu responded, "Maybe."  "Why are you asking?"

In late December 2005, the coworker from whom Almajid had bought the pistol received a telephone call from Almajid.  Almajid asked the man if he was watching the television program "America's Most Wanted."  The coworker replied that he was not.  Almajid then told the man that the gun the man had sold to Almajid had been used in a robbery.  Almajid said that his cousin had come to his house to get the gun, and that the gun had been used to kill someone.  The coworker told detectives that Almajid

---

[3]  The San Diego police department did not provide a copy of the surveillance videotape of the T&M Liquor store shooting to television stations until the following day.

had told him that after the robbery his cousin had taken the gun to Florida and that everything was "okay."

### 4. The uncharged August 29, 2005 Wells Fargo Bank robbery

On August 29, 2005, at approximately 9:40 a.m., three African-American men wearing hooded sweatshirts and bandanas over their faces entered the Wells Fargo Bank on Black Mountain Road in San Diego. Witnesses saw three weapons – a shotgun, an assault rifle, and a machine gun pistol. Photographs taken from surveillance video at the bank showed one man holding a black duffel bag and wearing black clothing and black gloves, and another man pointing a weapon.

The men yelled that it was a robbery and ordered the customers and bank employees to the ground. Two of the men jumped over the counter and demanded money from the bank employees. The men grabbed money from two teller drawers, and then ordered several employees into the vault area in the back of the bank. One of the men pointed a gun at an employee and demanded that she open the vault. After the employee opened the vault, the men took money from inside the vault and put it into the black duffel bag. After the men got the money from the vault and the teller drawers, they ran out of the bank.

The men ran to a waiting silver vehicle that was parked in front of the bank. That vehicle had been reported stolen the day before by the owner, who had left the key in the ignition while he went into a store. The location where the vehicle had been stolen was a few blocks away from where Coleman and Judd lived, i.e., the home where Saibu and Valentino had been hanging out that summer. Police officers eventually recovered the vehicle about three or four blocks away from the bank.

A witness who was driving on Ricker Road noticed two men, dressed all in black, running from a silver vehicle and getting into a red vehicle. Police traced ownership of the red vehicle to Rachel Kinsel, who was Coleman's girlfriend.

Police interviewed Kinsel, and subsequently conducted a search of Dewayne Cumming's home, where they recovered weapons.

Federal Bureau of Investigation Special Agent David Eaton testified that Saibu and Valentino had been identified as two of the three men who robbed the Wells

Fargo Bank, and that both had been tried and convicted for that robbery. Ken Buckley was also considered a person of interest in the Wells Fargo Bank robbery.

*5. Buckley's plea agreement and testimony*

Buckley was arrested on September 8, 2005, along with Valentino, and was charged with bank robbery. Buckley was a friend of Valentino's and knew Saibu. Buckley testified for the prosecution in this case, pursuant to plea agreement. He identified both Saibu and Valentino in court.

According to Buckley, Valentino often stayed at the Value Inn in Lemon Grove. Buckley worked at an adult bookstore located near the Value Inn. Valentino would visit Buckley at the bookstore.

Buckley was tried with Saibu and Valentino on charges related to the Wells Fargo Bank robbery. During that trial, Buckley participated in a "free talk" that was attended by the prosecutor, Detective Anthony Johnson (who was investigating the T&M Liquor store murder), and Buckley's defense counsel. Buckley disclosed information that he knew about the T&M Liquor store murder, with the understanding that the information would not be used unless Buckley agreed to cooperate with the prosecutor. Buckley originally decided not to cooperate, and did not testify against Saibu or Valentino in the trial of the Wells Fargo robbery. At the conclusion of that trial, the jury convicted Saibu and Valentino, but was unable to reach a unanimous verdict as to Buckley. Buckley was ordered to return for retrial.

In March 2007, Buckley reached an agreement with the prosecutor to testify in this case. Buckley pled guilty to robbery with the use of a firearm for his role in the Wells Fargo robbery. After Buckley provided testimony at the preliminary hearing in this case, he was sentenced to three years in state prison.

Buckley testified about a conversation that he had with Valentino regarding the T&M Liquor store shooting. Valentino had picked up Buckley from Judd's house and the two went to a car wash. Valentino asked Buckley if he had heard anything about robberies that had taken place in the area. Valentino told Buckley that Buckley could not tell anyone what Valentino was going to say.

Valentino proceeded to tell Buckley that he had robbed a store and just "shot the guy's head off with the

gauge." Valentino said that the shooting had taken place on El Cajon Boulevard. Valentino was angry because they were supposed to get $50,000 from the robbery, but ended up not getting any money.

Approximately a week after this conversation, Buckley went to Judd's house to talk with Saibu and Valentino about participating in a robbery with them. Saibu was planning the robbery, and Buckley was going to be the driver. Buckley heard Saibu say to Valentino, "Man, . . . I just told you to rob the place. I didn't know you [were] going there to shoot the guy['s] head off." Valentino responded, "Man, don't talk about that," and then walked out of the room.

While awaiting trial in the Wells Fargo Bank robbery case, Buckley spoke with Saibu while they were being detained together in the same jail cell. Buckley told Saibu that his lawyer had allowed him to see videotapes of the robberies and the shooting at the T&M Liquor store. Buckley mentioned that he had seen the gray BMW, and Saibu responded that the car that was used was not a gray BMW, but rather, a white Mercedes.

At the trial in the present case, Buckley viewed the surveillance video of the Hollywood Video robbery. Buckley had seen this video during his initial "free talk," and had told the detective that the man wearing the gray hooded sweatshirt was built like Saibu. Buckley believed the other man was Valentino. According to Buckley, at the time of the robbery of the Hollywood Video store, Valentino had long, black curly hair, which was pushing up the hood of Valentino's sweatshirt.

Buckley also viewed video of the July 12 attempted robbery of the T&M Liquor store. Prior to trial, Buckley had told detectives that the robber could have been either Saibu or Valentino, but said that the man had the same body type as Saibu and was wearing clothing that Buckley had previously seen Saibu wearing.

Buckley viewed video of the July 13 shooting, as well. Buckley testified that he had told the detective, during his "free talk" interview, that the man in that video had lighter skin than the man who attempted to rob the same store the day before, and that the man's skin tone and complexion matched Valentino's.

*6. Kinsel's plea agreement and testimony*

- 12 -

Rachel Kinsel agreed to cooperate with the prosecution in the bank robbery case, and agreed to provide testimony in the T&M Liquor store shooting case. Kinsel received a four-year prison sentence in exchange for her cooperation.

Kinsel met Saibu and Valentino through her ex-boyfriend, Coleman. Coleman lived at Judd's mother's house during the summer of 2005. Kinsel and a group of people including Judd, Coleman, Cummings, Buckley, Valentino, and Saibu would hang out at that house, watch television, play video games, drink alcohol, and smoke marijuana.

Kinsel agreed to be the getaway driver for the Wells Fargo Bank robbery. That day, she drove her car to an apartment complex to pick up Saibu. Saibu was carrying a bag with guns in it, which he placed in the trunk. Kinsel and Saibu then drove to Cummings's house, where Valentino eventually arrived in a stolen car. The men then got into the stolen car, and Kinsel followed them to the bank. Kinsel parked her car and waited for the men to rob the bank. About 10 to 15 minutes later, the men returned and took off their bandanas before getting into Kinsel's car.

(Lodg. No. 11 at 3-17 (minor edits made for clarity)).

## V. **STANDARD OF REVIEW**

This petition is governed by 28 U.S.C. § 2254(a), which provides the scope of review for federal habeas corpus claims:

The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

As amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, 28 U.S.C. § 2254(d) provides:

(d) [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings

1    unless the adjudication of the claim–

2        (1) resulted in a decision that was contrary to, or
3        involved an unreasonable determination of, clearly
         established Federal law, as determined by the Supreme
4        Court of the United States; or

5        (2) resulted in a decision that was based on an
         unreasonable determination of the facts in light of the
6        evidence presented in the State court proceeding.

7        When determining what constitutes "clearly established federal

8    law" under section 2254(d)(1), federal courts look to United States

9    Supreme Court holdings at the time of the state court's decision.  *Lockyer*

10   *v. Andrade*, 538 U.S. 63, 71-72 (2003).  A state court's decision is

11   "contrary" to "clearly established United States Supreme Court

12   precedent" if (1) the state court applies a rule different from the

13   governing law set forth in Supreme Court cases, or (2) the state court

14   confronts a set of facts that are materially indistinguishable from a

15   Supreme Court case, but still reaches a different result.  *Williams v.*

16   *Taylor*, 529 U.S. 362, 402-06, 412 (2000); *Lockyer*, 538 U.S. at 73.  A state

17   court decision does not have to demonstrate an awareness of clearly

18   established Supreme Court precedent, so long as neither the reasoning

19   nor the result of the state court decision contradicts such precedent.

20   *Early v. Packer*, 537 U.S. 3, 8 (2002).

21       A state court decision may involve an "unreasonable application" of

22   Supreme Court precedent "if the state court identifies the correct

23   governing legal rule from the Court's cases but unreasonably applies it to

24   the facts of the particular state prisoner's case."  *Williams*, 529 U.S. at

25   407-08.  Alternatively, an unreasonable application may be found "if the

26   state court either unreasonably extends a legal principle from [Supreme

27   Court] precedent to a new context where it should not apply or

28

unreasonably refuses to extend that principle to a new context where it should apply." *Id.* An unreasonable application of federal law requires the state court decision to be incorrect or erroneous. *Lockyer*, 538 U.S. at 76. Petitioner bears the burden of proving the state court acted in a manner contrary to clearly established federal law. *Woodford v. Viscotti*, 537 U.S. 19, 22 (2002).

The United States Supreme Court has held that "[w]here there has been one reasoned state judgement rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). "We think that a presumption which gives them no effect – which simply 'looks through' them to the last reasoned decision – most nearly reflects the role they are ordinarily intended to play." *Id.* at 804. When a state court does not supply reasoning for a decision, an independent review of the record is required to determine if the court clearly erred in applying controlling federal law. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This independent review is not *de novo*, but merely provides the basis for determining whether the state court decision was objectively reasonable. *Id.*

A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1171 (9th Cir. 2005). To demonstrate that a state court's admission of evidence violated his federal due process rights, a petitioner must show that admitted evidence "so fatally infected the proceedings as to render them fundamentally unfair." *Jammal v. Van de Kamp*, 926 F.2d 918, 918 (9th Cir. 1991). The Supreme Court has made few rulings regarding the admission of evidence as a violation of due process. *Holley*

*v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  Where "it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation . . . we cannot conclude that the state court's ruling was an 'unreasonable application' [of clearly established federal law]."  *Id.*

# VII.  DISCUSSION

Petitioner asserts four grounds for relief:

**Ground One:**  Petitioner claims his right to due process was violated by the improper admission of a previous conviction.

**Ground Two**:  Petitioner claims his right to due process was violated by the improper admission of digitally enhanced photographs as evidence.

**Ground Three**:  Petitioner claims his right to due process was violated by the cumulative effect of the evidentiary errors asserted in grounds one and two, and other errors at trial.

**Ground Four:**  Petitioner joins in all arguments raised by co-defendant, Saibu.

For the following reasons, the Court finds that the state court's holdings on Petitioner's grounds for relief  one, two, and three are objectively reasonable, and that ground four is not properly before this Court.  Accordingly, the Court **RECOMMENDS** the Petition be **DENIED.**

## A.    Ground One: Admission of Previous Conviction for Bank Robbery.

In Ground One, Petitioner challenges the trial court's decision allowing the prosecution to introduce evidence of Petitioner's previous conviction for bank robbery.  (ECF No. 1 at 6-14.)   California Evidence

Code section 1101(a) generally prohibits the introduction of "evidence of a person's character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) . . . when offered to prove his or her conduct on a specified occasion." California Evidence Code § 1101(b), however, allows for "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

The trial court allowed the admission of Petitioner's prior conviction for bank robbery finding it relevant to show identity and intent.

## 1. Trial Court Proceedings

Before trial commenced, the prosecution moved *in limine* to introduce as evidence three of Petitioner's previous convictions for bank robbery. (Lodg. No. 11 at 20.) Petitioner's counsel sought to exclude this evidence, arguing that the convictions did not meet the criteria for admissibility under California Evidence Code § 1101(b) and should be excluded under California Evidence Code § 352 as more prejudicial than probative.[4] (*Id.* at 20-21.) The trial court admitted one conviction, for the August 29, 2005 armed robbery of Wells Fargo Bank, finding it

---

[4] California Evidence Code § 352 provides:
"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

probative as to Petitioner's identity and intent. (*Id.* at 21-23.)

The trial court explained as follows:

> "Let me begin by acknowledging that there are a host of factors in there that [defense counsel] can and effectively did distinguish as not being the same, and a host of factors that [the prosecutor] points out are the same. But there are some that I think are particularly important.
>
> African-American males, generally generic same kind of clothing and hoodies, hiding the face, the take-down nature or take-over nature of the robbery, the use of the guns, those are general take-down robbery factors. But they are common to the bank robbery in count 9 and the offenses in counts 1, 2 and 3 involving T&M Liquor on July 13th.
>
> The factors that I think are persuasive are the use of a stolen car to get to the scene. [Defense counsel] has done a lot of federal cases, knows a lot about bank robberies, refers to it as a cold car and, in that fashion, as an advocate, wants me to find that that is a real general characteristic. It's certainly not a signature by itself, but I think it's an important one.
>
> The car was stolen from a location near a significant location in this case. It was stolen the same day or the day before. The reasonable inference is that the robbers arrived in that stolen car. They fled in that car. They fled a short distance, a matter of less than a mile, I think, in both cases. They abandoned the car. And what makes this different from any of the others is there were witnesses who said, 'These two guys abandoned this car and then ran into a waiting car that was real close by and took off'
>
> Another factor that I think is significant, and it is one that really does add a signature-type uniqueness to this case, [the prosecutor] alluded to, and that is the same two guys, looks like to me anyway – if I didn't think it was the same two guys, I wouldn't be letting it in – but it was, we know in the bank robbery, Mr. Saibu and Mr. Valentino and I think maybe a third person. Also this offense is proximate in time. It's close in time. It's a month later, month and a half later than the T&M robbery murder.
>
> I find and conclude that this uncharged act, and this one alone, will be admissible in this trial. So that I can be very clear, the uncharged act that formed the basis of count 9 in the bank robbery case – this was the Wells Fargo Bank

robbery on August 29th – is admissible as an uncharged act. I find it admissible against both defendants, and I find it can be used to show identity and intent to aid and abet with respect to counts 1 and 3 in this case. It's identity as to counts 1 and 3, and I will appropriately limit the jury instructions upon the request of counsel that that occur.

But I think this act meets the Hovarter/Ewoldt degree of similarity required to prove identity. Not common plan or scheme. Identity. This goes beyond common plan and scheme. This is identity. And I think it's also admissible to show their joint action and intent to aid and abet, which also goes to identity on those counts. The other uncharged acts are not admissible."

(*Id.* as quoted by the Court of Appeal.)

During trial, when this evidence was introduced, the trial judge again overruled objections raised by defense counsel and found the evidence admissible to prove both identity and intent. (*Id.* at 23.)

## 2. The State Court Decision on Appeal

On appeal, Petitioner argued that the trial court erred in admitting evidence of the prior bank robbery conviction because the evidence was unduly prejudicial. (Lodg. No. 5 at 26-48.) The California Court of Appeal observed that under California law evidence of uncharged crimes is admissible to prove identity and intent in the prosecution of charged crimes as long as the charged and uncharged crimes are sufficiently similar to support a rational inference. (Lodg. No. 11 at 21-26.) The degree of similarity required depends on the purpose for which the evidence is introduced. A lesser degree of similarity is required to prove intent, while evidence of identity requires the highest degree of similarity. (*Id.* at 23-24.) "For identity to be established . . . the pattern and characteristics of the crime must be so unusual and distinctive as to be like a signature." (*Id.* at 24 (quoting *People v. Lynch*, 50 Cal. 4th 693, 736 (2010).) However, evidence of identity "need not depend on one or

1  more unique or nearly unique common features; features of substantial

2  but lesser distinctiveness may yield a distinctive combination when

3  considered together." (*Id.*)

4      The Court of Appeal found that the trial court:

5          noted a number of marks of similarity between the Wells
           Fargo robbery and the charged offenses . . . [that] when

6          combined with a number of unique characteristics . . . were
           sufficient . . . to permit the introduction of evidence

7          regarding the uncharged offense for the purpose of

8          establishing not only intent with respect to the T&M
           Liquor store attempted robbery/shooting, but also the

9          identities of the perpetrators of the charged crimes.

10  (*Id.* at 24-25.)

11      Basing their decision on the trial court's observations the Court of

12  Appeal found that "[i]n the aggregate, the similarities among the

13  uncharged and charged crimes become more meaningful, and lead to the

14  reasonable inference that Saibu and Valentino were the persons who

15  committed the crimes, and that they intended to rob the T&M Liquor

16  store." (*Id.* at 25-26 (citation omitted).)  Thus, the Court of Appeal

17  concluded, "the trial court did not abuse its discretion in admitting

18  evidence of the Wells Fargo Bank robbery at the trial in this case." (*Id.*)

19      The Court of Appeal also found that even if the bank robbery

20  conviction was admitted improperly for the purpose of identity, the error

21  would be harmless.  (*Id.* at 26-28.)  The Court reasoned as follows:

22          Error involving the admission of other crimes

23          evidence is subject to the prejudice standard announced in
           *People v. Watson* (1956) 46 Cal.2d 818.  (*People v. Welch*

24          (1999) 20 Cal.4th 702, 749-750.)  Under this standard, we

25          determine whether it is reasonably probable that the
           defendant would have obtained a more favorable outcome if

26          the error had not occurred.  (*Watson* at p. 836.)

27          The trial court did not rely on identity alone as the

28          basis for admitting evidence of the Wells Fargo robbery.

Rather, the court concluded that this evidence was also relevant to demonstrate the 'joint action' of the appellants, as well as Saibu's intent to aid and abet Valentino in the attempted robbery of the T&M Liquor store. The degree of similarity that is required between evidence of uncharged acts and the charged offense, for the purpose of proving intent, is significantly less than that required to establish identity (see *Lynch*, *supra*, 50 Cal.4th at p. 736). The trial court could have reasonably concluded that evidence of the Wells Fargo robbery was more probative than prejudicial with respect to the issue of intent, and, therefore, could have properly admitted evidence of the Wells Fargo robbery for the purpose of proving that the perpetrators intended to rob the liquor store on the day of the shooting.[5] Thus, the error that we are presuming, for purposes of argument, is the failure of the trial court to instruct the jury that it could consider the evidence of the Wells Fargo robbery only to determine the defendants' intent.

We conclude that it is not reasonably probable that either defendant would have obtained a more favorable outcome if the trial court had admitted the evidence for the purpose of proving the defendant's intent, and had provided a limiting instruction prohibiting the jury from considering the evidence for the purpose of determining identity. The jury viewed videotape evidence from all of the crimes and saw still photos created from those videotapes. With respect to the Hollywood Video store robbery, Saibu's DNA was found on a shotgun used during the robbery, Valentino told Buckley that he had robbed a Hollywood Video store,

---

[5]    The defendants' intent with respect to the July 13, 2005 incident was at issue at trial, since Valentino shot at the victims almost immediately after yelling "Give me the money." During closing, in arguing that the video evidence of Yakou reaching his hand toward the register demonstrated that the perpetrator's intent was to rob the liquor store, the prosecutor stated: "Mr. Yakou is at the register. His hand is on the register. Why would he be doing that if he had not, in fact, heard the words, 'Give me the money'; if that were not, in fact, the intent of the perpetrator?" Because the evidence left open the possibility that the shooting was done in retaliation for the thwarted robbery attempt the day before, evidence that Valentino and Saibu had previously committed other armed robberies together tended to show that they intended to rob the liquor store on July 13, 2005, as well.

and Buckley identified Saibu and Valentino from the
Hollywood Video store security videotape.  With respect to
the July 12, 2005 T&M Liquor store attempted robbery,
during a live lineup, victim Mikho identified Saibu as
resembling the perpetrator, Almajid identified Saibu from
the surveillance videotape, and Saibu's DNA was found on
the shotgun and the shells that police recovered from the
scene.

With respect to the July 13, 2005 attempted robbery
and murder at the T&M Liquor store, there was evidence
from which the jury could reasonably infer that Saibu had
taken a .38 caliber silver-colored revolver from Almajid's
apartment.  A witness saw a man wearing baggy clothing a
carrying a silver revolver running away from the liquor
store after the shooting.  Another witness spotted the
stolen white Mercedes Benz in an alley and identified
Valentino as one of the men who got out of that car.  A
third witness noticed that one of the men standing next to
the Mercedes Benz had darker skin that the other man.
Valentino's prints were lifted from the trunk of the
Mercedes Benz, and Valentino admitted to Buckley that he
had shot a man while robbing a liquor store on El Cajon
Boulevard.  Buckley also heard Saibu say to Valentino, a
couple of weeks after the shooting, "Man, I just told you to
rob the place.  I didn't know you were going to shoot the
guy's head off."  During another conversation, when
Buckley referred to the car that was used during that
attempted robbery as a gray BMW, Saibu corrected him
and said that in fact the car was a white Mercedes Benz.
In addition, Saibu told Almajid that he was waiting in the
car during the shooting.

Based on the state of the evidence, it is not
reasonably probable that either Saibu or Valentino would
have obtained a more favorable outcome if the trial court
had instructed the jury that it could consider evidence of
the Wells Fargo robbery only for the purpose of
determining the defendant's intent, and not to determine
identity.

(*Id.* at 26-29.)

//

//

1          **3. Analysis**

2          Petitioner argues that the potential prejudice of admitting the

3    previous conviction so outweighed its probative value as to constitute a

4    violation of his federal due process rights.  (ECF No. 1 at 6-14.)

5          The issue for this Court is whether the Court of Appeal's ruling

6    was contrary to, or an unreasonable application of clearly established

7    federal law.  28 U.S.C. § 2254(d).  A legal principle is "clearly

8    established" withing the meaning of §2254(d)(1) if "it is embodied in a

9    holding of [the Supreme] Court."  *Carey v. Musladin*, 549 U.S. 70, 74

10   (2010).  Although the Supreme Court has said that the writ should issue

11   "when constitutional errors have rendered the trial fundamentally

12   unfair," the Court "has not yet made a clear ruling that admission of

13   irrelevant or overtly prejudicial evidence constitutes a due process

14   violation sufficient to warrant issuance of the writ."  *Holley*, 568 F.3d at

15   1101.

16         Here, the Court of Appeal agreed with the trial court that the

17   conviction was admissible as to intent and identity.  Even assuming that

18   the conviction was improperly admitted as to identity, it would still have

19   been admissible as to intent.  On that basis, the Court of Appeal

20   conducted an error analysis based on the failure to provide a proper

21   limiting instruction.  (Lodg. 11 at 26.)  The Court determined that any

22   resulting error would be harmless error.  (*Id.*)

23         For purposes of federal habeas review, it is "irrelevant" whether an

24   evidentiary ruling is correct or not under state law; the only question is

25   whether the ruling rendered the trial so fundamentally unfair as to

26   violate due process.  *Larson v. Palmateer*, 515 F.3d 1057, 1065 (9th Cir.

27   2008).  In order for an evidentiary ruling to be so fundamentally unfair

28

1   as to allow issuance of the writ, clearly established federal law must
2   have been violated.  *See Musladin*, 549 U.S. at 74; *Holley*, 568 F.3d at
3   1101.  Clearly established federal law is established as such by the
4   Supreme Court.  *See Williams*, 529 U.S. 362, 391 (2000).

5       This Court accepts the Court of Appeal's analysis as a state's
6   interpretation of its own laws, and finds no federal constitutional
7   violation because the Court of Appeal's decision was not contrary to or
8   an unreasonable application of clearly established federal law.  *See*
9   *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

10      Accordingly, the Court recommends Ground One be **DENIED**.

11  **Ground Two: Admission of Electronically Enhanced**
12  **Photographs.**

13      In Ground Two, Petitioner challenges the admission of
14  electronically enhanced photographs as evidence of identity in his trial.
15  (ECF No. 1 at 15-21.)  Petitioner argues that the photographs should
16  have been excluded because (1) they involved expert testimony of an
17  undisclosed expert constituting a discovery violation; (2) they were
18  admitted with insufficient foundation; and (3) they should have been
19   subject to a *Kelly* hearing[6] as new scientific evidence.

20          **1. The Trial Court Proceedings**

21      The facts as related by the Court of Appeal are as follows:

22          Nathan Cunningham, an investigative technician
            with the San Diego County District Attorney's Office,
23          created digital still images from VHS copies of surveillance
            videotapes from the T&M Liquor store incidents.
24          Cunningham used the still images to prepare photo boards
25          that the prosecutor ultimately used as courtroom exhibits

26  _____

27      [6] A *Kelly* hearing is held where the evidence set forth at trial involves
    a 'new' scientific technique or principle.  *People v. Kelly*, 17 Cal. 3d 24, 30
28  (1976).

1    at trial.

2          Prior to Cunningham's testimony, defense counsel
     asked the trial court for a sidebar conference to discuss the
3    process that Cunningham had used to digitally enhance the
     still photographs.  The court ultimately held an Evidence
4    Code section 402 hearing, outside the presence of the jury,
     to consider whether the photographic exhibits were
5    admissible.

6          At the foundational hearing, Cunningham testified
     that he specialized in graphics and 3-D animation.
7    Cunningham is familiar with computer software programs
     used to enhance or enlarge photographs, such as Adobe
8    Photoshop (Photoshop).  Cunningham has used Photoshop
     for eight years, and is knowledgeable about the latest
9    versions of the program.  According to Cunningham,
     Photoshop is frequently used by those who prepare
10   demonstrative exhibits and is considered an essential tool
     that is widely used in that field.
11
           Cunningham made exhibit 146, photograph E, and
12   exhibit 171, photograph C, from a VHS videotape.
     Cunningham enlarged the still images, which is something
13   that he does on almost a daily basis in preparing exhibits.
     Cunningham explained how he created photograph C of
14   exhibit 146, which is an enlargement of a portion of
     photograph E of exhibit 146.  Cunningham also described
15   how he utilized a particular Photoshop enhancement tool to
     make the color from the color video stand out more in the
16   still image.  Specifically, Cunningham placed a digital copy
     of the image on top of the original image, and changed the
17   blending mode to "Color Dodge."  Cunningham explained
     that this process causes lighter colors in the image to
18   become brighter than darker colors, which ultimately
     brightens the color overall.  Cunningham used this same
19   process with respect to the photographs depicted in exhibit
     171.
20
           Cunningham testified that the Color Dodge process
21   did not create the same amount of contrast in the photos in
     exhibit 171 as in those in exhibit 146.  He explained that
22   this is because the videotaped footage used to make the
     still images in the two exhibits had been taken at different
23   times of day, under different lighting conditions, and from
     different angles.
24
           According to Cunningham, using the Color Dodge
25   mode does not import new or different colors into an image.
     Rather, the Color Dodge mode allows one to overlap an
26

27

28

exact copy of an image over the original image in such a way that it provides additional contrast and makes colors appear brighter.

Cunningham also explained pixels, and how the scaling of different images can sometimes affect the quality of the image and/or require the computer software to use a complicated equation to fill in pixels when an image is enlarged.

Cunningham said that he had not tried to enhance the skin tone of the person depicted in exhibit 146, photograph A, but that what he was trying to do was to enhance the value and brightness of the entire photograph. Upon further questioning from the court, Cunningham explained that the Color Dodge mode is like the brightness and contrast settings on a television set. It is a mode that affects lighter colors more, such that they become brighter, but allows darker colors to remain the same. It does not add color, but essentially brightens the entire image.

After Cunningham testified at the foundational hearing, the prosecutor noted that photographs in exhibits 146 and 171 had already been introduced at trial, with no objection from defense counsel.

Counsel for Valentino argued that he was not aware of the existence of exhibit 146 until Buckley testified at trial.[7] Counsel asserted that if he had known that an enhancement process had been used on the photographs, he would have found an expert witness to explain that the skin tone fo the individual depicted in exhibit 146, photograph C, was not a fair and accurate depiction of the subject's skin tone. Counsel further argued that it was clear that the process Cunningham had used was a technical process that was outside the common understanding of a juror. Valentino's counsel requested that the trial court exclude exhibit 146, as a remedy for the prosecutor's discovery violation in failing to inform him about the digital enhancement, and also objected to the exhibit on the ground that there was no foundation as to how the exhibit had been enhanced.

The trial court considered whether Cunningham's testimony involved a scientific process that implicated expert opinion testimony and *Kelly*, and whether the

---

[7] Buckley had testified that he could tell that the person depicted in some of the surveillance was Valentino, based on that individual's light skin.

prosecutor's failure to disclose the use of the Photoshop enhancement constituted a discovery violation, or rather, whether Cunningham's testimony pertained to a commonly accepted enhancement technique that someone could do on a home computer. The court concluded that Cunningham's testimony about the images, and how he created them, qualified as expert testimony under Evidence Code section 801, but that the technique that Cunningham used was not new, and, therefore, that *Kelly* did not apply. The trial court ruled that it would not exclude Cunningham's testimony or the exhibits as a sanction for the prosecutor's discovery violation in failing to disclose the digital enhancement process, but agreed to allow defense counsel the opportunity to try to find an expert who would cast doubt on the reliability of the process that Cunningham had used in creating the still images.

Valentino's counsel acknowledged that he "personally believe[d] everything Mr. Cunningham did is what everybody does with that software," but indicated he was more concerned with Cunningham potentially testifying that the photographs accurately depicted the subjects' skin tone. The trial court observed that if the jury understood the photographs as accurately depicting skin tone, this would benefit Valentino, because the skin tone of the individual in exhibit 146 was not similar to Valentino's skin tone.

After this discussion, court adjourned for the weekend. On the first day of court the following week, Valentino's counsel informed the court that he had contacted an individual at a company that specializes in preparing exhibits like the ones Cunningham had prepared, but that the person he had contacted believed he had a conflict because he knew Cunningham very well. Valentino's counsel said that he had a list of other potential experts whom he could call, but he did not know whether he would be able to find an expert who would be available to testify. The prosecutor noted that because of a mix-up with witnesses for that day, there was some time for an expert to "look at the process." The court then moved on to other business.

The following day, the trial court raised the "Photoshop issue" with the attorneys. Valentino's attorney indicated that he did "not have any expert who can offer an opinion as to whether the process of enlargement" "alters the details of facial features to the point where it could no

longer be viewed as a fair and accurate representation of what is depicted." Counsel stated that his concern was "that any facial features may be distorted to the point where you can't look at it and say whether it's a fair and accurate representation of what the person looked like, because it's been enlarged by a computer process." Counsel requested that the court give a limiting instruction to the effect that the jury could consider exhibit 146 only for the "skin tone of the shooter," and for "no other purpose."

The court made three rulings with respect to Cunningham's testimony. The court first addressed the *Kelly* issue, and determined that the enlargement of digital images, even by computer software, is not new, and that the process that Cunningham used "passes [*Kelly*] muster." The court also determined that the process that Cunningham used implicated expert opinion and "should have been disclosed as such," but found that the prosecutor had not deliberately violated the discovery rules. The court rejected defense counsel's request that the court give a jury instruction to the effect that the evidence had not been timely disclosed, and also determined that the evidence, including both photographic exhibits (146 and 171), as well as Cunningham's testimony regarding the process that he used to create the exhibits, would be admitted. The court noted that it had "grant[ed] a continuance of sorts to let the defense have a chance to try to meet this testimony."

Cunningham later testified at trial regarding the Photoshop process that he used to create photo board exhibits 146 and 171.

(Lodg. 11 at 29-35.)

## 2. The State Court Decision on Appeal

On appeal, Petitioner argued that the trial court should have excluded both the challenged photographs and the testimony relating to the photographs as a sanction for the prosecutor's discovery violation. (Lodg. No. 11 at 35.) The Court of Appeal found that the trial judge did not abuse his discretion in admitting the photographs despite the discovery violation. (*Id*. at 35-36.) The Court of Appeal noted that a trial court has great discretion to choose from a range of sanctions in the event of a discovery violation and that there is no requirement that a

sanction be imposed.  (*Id.*)  The Court of Appeal noted that the

admission of digitally enhanced photographs is common practice and a

*Kelly* hearing was not required.  (*Id.* at 36-37.)  The Court of Appeal also

found that sufficient testimony was presented to lay a proper foundation

for the admission of the photographs.  (*Id.* at 38.)  Therefore, the Court

of Appeal rejected petitioner's arguments, affirmed the trial judge's

decision, and found that the trial judge did not abuse his discretion

when he weighed the nature of the discovery violation and decided not to

impose a sanction.  (*Id.* at 36)

In sum, the Court of Appeal found that the admission of the

digitally enhanced photographs was not in error.  (*Id.*)

### 3. Analysis

Petitioner claims that the admission of digitally enhanced

photographs so prejudiced the trial as to constitute a violation of his

federal due process rights.  (ECF No. 1 at 15-21.)

This Court reviews the Court of Appeal to ensure its decision

was not contrary to, or an unreasonable application of, clearly

established federal law.  28 U.S.C. § 2254(d).  The Court of Appeal

reviewed the trial court for error and concluded the photographs were

not admitted erroneously.  (Lodg. No. 11 at 35-38.)  Specifically, the

Court found: (1) There was no requirement to impose a sanction for the

discovery violation, and the trial judge did not abuse his discretion; (2)

The admission of the photographs without a *Kelly* hearing was proper as

it is common practice to admit enhanced photos; and (3) A proper

foundation was laid to admit the photographs.  (*Id.*)

This Court accepts the Court of Appeal's analysis as a state's

interpretation of its own laws, and finds no federal constitutional

violation because the Court of Appeal's decision was not contrary to or an unreasonable application of clearly established federal law. *See Estelle*, 502 U.S. at 67-68. Therefore, the Court finds that the admission of the digitally enhanced photographs did not violate Petitioner's right to due process. *See Holley*, 568 F.3d at 1101.

Accordingly, the Court recommends Ground Two be **DENIED**.

**Ground Three: Cumulative Effect of Errors at Trial.**

In Ground Three, Petitioner contends that the cumulative effect of the evidentiary errors asserted in Grounds One and Two, and other unspecified errors, violated his right to due process. (ECF No. 1 at 23.) On appeal, the California Court of Appeal rejected Petitioner's cumulative error claim, stating: "[i]n the absence of any additional errors,[8] we conclude that there is no cumulative error on which to base a reversal of the judgment against either defendant." (Lodg. No. 11 at 50-51.)

"The Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007); *see also Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,'… and thereby had a 'substantial and injurious effect or influence' on the jury's

---

[8] "Additional errors" referred to the administrative errors that the Court of Appeals ordered corrected on Petitioner's sentencing file for time served.

1  verdict." *Parle*, 505 F.3d at 928 (internal citations omitted).

2      The Court of Appeal addressed each of the alleged errors that

3  Petitioner contends together give rise to cumulative error and found no

4  error occurred.  (Lodg. No. 11 at 50-51.)  Thus, unlike in *Parle*, there is

5  nothing to cumulate.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir.

6  2011) ("Because we conclude that no error of constitutional magnitude

7  occurred, no cumulative prejudice is possible."); *Mancuso*, 292 F.3d at

8  957 ("Because there is no single constitutional error in this case, there is

9  nothing to cumulate to a level of a constitutional violation.")  Therefore,

10  the California Court of Appeal reasonably rejected Petitioner's

11  cumulative error claim.

12      The Court of Appeal reviews the trial court for error.  This Court

13  reviews the Court of Appeal's error findings for constitutional error.

14  Where there is no single constitutional error, there is no cumulative

15  prejudice that may result.  *See id.*  Because the Court of Appeal

16  reasonably did not find any error and reasonably rejected Petitioner's

17  cumulative error claim, this Court does not find any constitutional error

18  to cumulate.  Thus, Ground Three does not warrant federal habeas relief

19  and the Court recommends it be **DENIED**.

20
21      **Ground Four: Petitioner joins in beneficial claims
        presented by co-defendant Saibu.**

22
23      In his final claim, Petitioner seeks to join in the claims made by

24  Saibu in his pending habeas action pursuant to Rule 8.200(a)(5) of the

25  California Rules of Court.  (ECF No. 1 at 24; ECF No. 21 at 10-11.)

26  However, the California Rules of Court are inapplicable to Petitioner's

27  federal habeas action.  *See Day v. McDonough*, 547 U.S. 198, 207 (2006)

28  (holding the Rules Governing Section 2254 Cases in the United States

12-cv-00917-LAB (MDD)

District Courts ("Federal Habeas Rules") are the procedural Rules governing federal habeas petitions from state prisoners.)  The rules governing this action prohibit Petitioner from simply joining Saibu's claims.  Rule 2(c) of the Federal Habeas Rules requires each habeas petition to "(1) specify all grounds for relief available; (2) state the facts supporting each ground; [and] (3) state the relief requested..."  28 U.S.C. foll. § 2254, Rule 2(c).  Here, because Petitioner fails to state any specific ground for relief, the Court recommends Ground Four be **DENIED**.

### VIII.  <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) approving and adopting this Report and Recommendation and (2) denying Petitioner's petition for writ of habeas corpus.

**IT IS HEREBY ORDERED** that any written objections to this Report must be filed with the Court and served on all parties no later than May 7, 2013.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objection shall be filed with the Court and served on all parties no later than May 21, 2013.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED**.

DATED:  April 16, 2013

Hon. Mitchell D. Dembin
U.S. Magistrate Judge